## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-24767-MOORE/Elfenbein

**TISSOT SA**,

  Plaintiff,

v.

**ROTWATCHES.COM** and
**SALESTORETODAY.COM**,
each an individual, business entity, or
unincorporated association

  Defendants.        /

## REPORT AND RECOMMENDATION ON
## MOTION FOR DEFAULT FINAL JUDGMENT

**THIS CAUSE** is before the Court on Plaintiff Tissot SA's Motion for Entry of Default

Final Judgment against Defendants Rotwatches.com and Salestoretoday.com, each of which is an

individual, business entity, or unincorporated association (the "Motion"), ECF No. [43].  The

Honorable K. Michael Moore referred the Motion to me "to take all necessary and proper action

as required by law and/or to issue a Report and Recommendation regarding Plaintiff's Motion for

Default Judgment." *See* ECF No. [44].  For the reasons explained below, I respectfully

**RECOMMEND** that the Motion, **ECF No. [43]**, be **GRANTED**.

## I. BACKGROUND

This case concerns four "world-famous common law and federally registered trademarks"

owned by and registered to Plaintiff Tissot SA (the "Tissot Marks"). [1]  *See* ECF No. [19] at 2, 5.

---

[1] Because Plaintiff has obtained a clerk's entry of default, *see* ECF No. [40], the Court accepts as true its well-pleaded factual allegations, *see TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1298 (S.D. Fla. 2016), but not its conclusions of law, *see Surtain v. Hamlin Terrace Found*, 789 F.3d 1239, 1245 (11th Cir. 2015).

The Tissot Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified therein, including luxury watches from the Tissot brand.  *See* ECF No. [19] at 5.

Plaintiff "has expended substantial resources developing" the Tissot Marks, *see* ECF No. [19] at 6, and has used them since 1959, 1993, 1999, and 2002, respectively, *see* ECF No. [19-1]. "[F]or an extended period of time," Plaintiff has used the Tissot Marks "in interstate commerce to identify and distinguish" Plaintiff's "high-quality goods" and to "serve as symbols of" Plaintiff's "quality, reputation and goodwill."  *See* ECF No. [19] at 6.  Because Plaintiff "extensively uses" the "Tissot Marks in the United States in connection with the sale of high-quality goods," the "Tissot Marks are widely recognized trademarks in the United States" and "have achieved secondary meaning among consumers as identifiers of high-quality goods."  *See* ECF No. [19] at 6.

Plaintiff has also "expended substantial resources . . . advertising and otherwise promoting the Tissot Marks," including "in magazines, [in] newspapers, in stores, on the Internet, and in other media worldwide," like "Tissot's official website, www.tissotwatches.com."  *See* ECF No. [19] at 6.  "Visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing, is important to" Plaintiff's "overall marketing and consumer education efforts," so plaintiff expends "significant monetary and other resources on Internet marketing and consumer education, including search engine optimization and search engine marketing strategies."  *See* ECF No. [19] at 6–7.  "Those strategies allow" Plaintiff "and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Tissot Marks and the goods sold thereunder." *See* ECF No. [19] at 7.

As a result of all these actions, the "Tissot Marks qualify as famous marks as that term is

used in 15 U.S.C. § 1125(c)(1)." *See* ECF No. [19] at 6.  To protect its famous marks, Plaintiff "has carefully monitored and policed the use of the Tissot Marks." *See* ECF No. [19] at 6.  Even so, "[l]ike many other famous trademark owners," Plaintiff "suffers ongoing daily and sustained violations of its trademark rights at the hands of counterfeiters and infringers," who "wrongfully reproduce and counterfeit" Plaintiff's "trademarks for the twin purposes of (i) duping and confusing the consuming public and (ii) earning substantial profits across their e-commerce stores." *See* ECF No. [19] at 3.  "The natural and intended byproduct of" those "combined actions is the erosion and destruction of the goodwill associated with" Plaintiff's "name and trademarks, as well as the destruction of the legitimate market sector in which it operates." *See* ECF No. [19] at 3.

Defendants are among those counterfeiters and infringers.  *See* ECF No. [19] at 3.  More specifically, "Defendants are individuals, business entities of unknown makeup, or unincorporated associations" that "are promoting, selling, offering for sale, and/or distributing goods using counterfeits and confusingly similar imitations of" Plaintiff's "trademarks within this district through various Internet based e-commerce stores operating under the seller names identified on Schedule 'A'" (the "E-commerce Store Names").  *See* ECF No. [19] at 1, 3.  They "use aliases in conjunction with the operation of their businesses, including but not limited to those identified by Defendant Number on Schedule 'A.'"  *See* ECF No. [19] at 4.  Plaintiff "has used the Tissot Marks extensively and continuously before Defendants began offering counterfeit and confusingly similar imitations of Tissot's goods," *see* ECF No. [19] at 7, and "never assigned or licensed the Tissot Marks to any of the Defendants," *see* ECF No. [19] at 6.

Despite not having a license to use the Tissot Marks, Defendants are using Plaintiff's "famous name and/or trademarks to drive Internet consumer traffic to their e-commerce stores

operating under the E-commerce Store Names, thereby increasing the value of the E-commerce Store Names and decreasing the size and value of" Plaintiff's "legitimate marketplace at" Plaintiff's expense.  *See* ECF No. [19] at 5.  Because "Defendants will likely continue to register or acquire new e-commerce store names or aliases, as well as related payment accounts, for the purpose of selling and offering for sale goods using counterfeit and confusingly similar imitations of one or more of" Plaintiff's "trademarks unless preliminarily and permanently enjoined," *see* ECF No. [19] at 4–5, Plaintiff filed this lawsuit in December 2024 to seek that relief, *see* ECF No. [1].

About six weeks later, on January 15, 2025, Plaintiff filed an Amended Complaint asserting four claims: (1) federal trademark counterfeiting and infringement, in violation of 15 U.S.C. § 1114; (2) false designation of origin, in violation of 15 U.S.C. § 1125(a); (3) common law unfair competition; and (4) common law trademark infringement.  *See* ECF No. [19] at 10–14.  Broadly, Plaintiff alleges that Defendants wrongfully reproduce and counterfeit Plaintiff's trademarks to attract consumers to whom they sell their goods, which are of "different quality" from Plaintiff's authentic goods.  *See* ECF No. [19] at 7.  Plaintiff alleges that Defendants do so "with the knowledge and intent that such goods will be mistaken for the genuine, high-quality goods offered for sale by" Plaintiff and "with knowledge that they are not authorized to use Plaintiff's trademarks." *See* ECF No. [19] at 7, 9.

Because Plaintiff asserts that Defendants are likely to transfer or hide their assets to avoid payment of a monetary judgment, Plaintiff alleges it has no adequate remedy at law, is suffering irreparable injury, and has suffered substantial damages from Defendants' infringing Plaintiff's trademarks. *See* ECF No. [19] at 10.  Accordingly, Plaintiff seeks wide-ranging injunctive relief. *See* ECF No. [19] at 14.

Defendants use aliases in conjunction with the operation of their businesses, *see* ECF No. [19] at 4, so Plaintiff was unable to serve them using traditional methods. For that reason, Plaintiff filed an *Ex Parte* Motion for Order Authorizing Alternate Service of Process of Defendants asking the Court to allow it to serve Defendants by electronic mail and website posting. *See* ECF No. [7]. After the Court granted that Motion, *see* ECF No. [12], Plaintiff served Defendants with their respective Summons and a copy of the Amended Complaint by electronic mail and website posting, *see* ECF No. [35]. Despite that service, Defendants have not responded to the Amended Complaint. As a result, Plaintiff filed a Request for Clerk's Entry of Default as to Defendants. *See* ECF No. [39]. The Clerk of the Court entered default against Defendants on February 27, 2025. *See* ECF No. [40].

On March 17, 2025, Plaintiff filed the Motion.[2] *See* ECF No. [43]. In the Motion, Plaintiff "seeks default judgment finding Defendants liable on all counts of" the Amended Complaint pursuant to Federal Rules of Civil Procedure 55 and 58. *See* ECF No. [43] at 1, 10. Under that umbrella, Plaintiff asks for five specific types of relief: (1) "a permanent injunction" pursuant to Rule 65; (2) the "cancelation" of "the e-commerce stores at issue" or the transfer of them to Plaintiff; (3) the permanent disabling, delisting, or de-indexing of the e-commerce stores and their websites from all search engines to ensure they cannot "be used as a means for selling goods bearing and/or using counterfeits and infringements of" Plaintiff's trademarks; (4) an "award of statutory damages" pursuant to 15 U.S.C. § 1117(c); and (5) an "order transferring all funds

---

[2] Plaintiff previously filed an *Ex Parte* Application for Entry of Temporary Restraining Order, Preliminary Injunction, and Order Restraining Transfer of Assets. *See* ECF No. [6]. Judge Moore granted Plaintiff a Temporary Restraining Order and an Order Restraining Defendants' Transfer of Assets, and he referred Plaintiff's request for Preliminary Injunction to me. *See* ECF No. [14]. After holding a hearing on Plaintiff's request for Preliminary Injunction, *see* ECF No. [15]; ECF No. [26], the undersigned issued a Report and Recommendation ("R&R") recommending that a preliminary injunction be entered, *see* ECF No. [29]. Judge Moore adopted the R&R and issued the preliminary injunction. *See* ECF No. [46].

currently restrained or held on account for Defendants by all financial institutions to" Plaintiff "in partial satisfaction of any award of damages" pursuant to Rule 65, 15 U.S.C. § 1117, and 28 U.S.C. § 1651(a).  *See* ECF No. [43] at 1–2; ECF No. [43-3] at 10–15.

Defendants have not responded to the Motion, and the deadline to do so has passed.  The Motion is now ripe for review.

## II.   LEGAL STANDARDS

### A.  Default Judgment Standard

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55 (a).  After the clerk enters a default, the Court is authorized to enter a final default judgment if the party seeking it applies for one.  *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244 ("When a defendant has failed to plead or defend, a district court may enter judgment by default.").

"A 'defendant, by his default, admits the plaintiff's well-pleaded allegations of fact' as set forth in the operative complaint."  *TracFone*, 196 F. Supp. 3d at 1298 (quoting *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009)).  But the defendant "is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Surtain*, 789 F.3d at 1245 (quotation marks omitted).  And a defendant's default does not automatically permit the Court to enter a default judgment: "Because the defendant is not held to admit facts that are not well pleaded or to admit conclusions of law, the court must first determine whether there is a sufficient basis in the pleading for the judgment to be entered."  *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1259 (S.D. Fla. 2019); *see also Surtain*, 789 F.3d at 1245 ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for

the judgment entered." (quotation marks omitted)).

The Eleventh Circuit has "interpreted the standard" for evaluating whether a sufficient basis for default judgment exists "as being akin to that necessary to survive a motion to dismiss for failure to state a claim." *Surtain*, 789 F.3d at 1245; *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim."). Of course, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "This plausibility standard is met 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Surtain*, 789 F.3d at 1245 (quoting *Iqbal*, 556 U.S. at 678).

## B. Trademark and Unfair Competition Law

### 1. Federal Trademark Infringement (15 U.S.C. § 1114)

"Section 32 of the Lanham Act, 15 U.S.C. § 1114, provides liability for trademark infringement if, without the consent of the registrant, a defendant uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive.'" *Chanel, Inc.*, 362 F. Supp. 3d at 1262 (quoting 15 U.S.C. § 1114). "To prevail on a trademark infringement claim under 15 U.S.C. § 1114, the plaintiff must show that it owns a valid trademark, that its mark has priority, that the defendant used such mark in commerce without the plaintiff's consent, and that the defendant's use is likely to cause consumer confusion as to the source, affiliation or sponsorship of its goods or services." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264–65 (S.D. Fla. 1999); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1262 (consolidating those four elements into two: plaintiff

"had prior rights to the mark at issue" and defendants "adopted a mark or name that was the same, or confusingly similar to" it "such that consumers were likely to confuse the two").

Registration of a mark with the United States Patent and Trademark Office ("USPTO") is "prima facie evidence" of its "validity," "the registrant's ownership of" it, and "the registrant's exclusive right to use" it "in commerce" or "in connection with the goods or services specified in the registration." *See* 15 U.S.C. § 1115(a).  A plaintiff's mark has priority if the plaintiff began using the mark before the defendant began using its competing mark.  *See PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004) (noting that plaintiff's mark had priority because it had been selling its products for five years before defendant created the competing domain names).  One way a defendant can use a mark in commerce is by "establishing a website on the Internet" that contains the mark.  *See id.*

"In determining the likelihood of confusion, the court must analyze the following seven factors: (1) the type of trademark; (2) the similarity of the marks; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets and purchasers; (5) the similarity of the advertising media used; (6) the defendant's intent; and (7) actual confusion." *Carnival Corp.*, 74 F. Supp. 2d at 1265.  There are "four categories" of marks: generic; descriptive; suggestive; and "fictitious, arbitrary or fanciful." *See Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1540 (11th Cir. 1985) (citation omitted).  "The categories are based on the relationship between the name and the service or good it describes." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

The Eleventh Circuit has described the difference between the categories this way:

> The demarcation between each category is more blurred than it is definite.  A term which suggests the basic nature of the service is generic.  The term Milk Delivery is an example of a generic service mark for a hypothetical milk delivery service.  A generic term is typically incapable of achieving service mark protection

because it has no distinctiveness. A descriptive term merely identifies a characteristic or quality of a service. An example of a descriptive service mark might be BarnMilk. Because a descriptive service mark is not inherently distinctive, it may be protected only if it acquires a secondary meaning. The personal name component of a service mark such as Barney's to denote a milk delivery service is also considered not inherently distinctive and hence merely descriptive. However, if the personal name mark acquires secondary meaning, it is afforded the strength of an inherently distinctive mark. Marks which are descriptive of geographic location of the source of the service are treated in the same manner as personal name marks. A suggestive term suggests the characteristics of the service and requires an effort of the imagination by the consumer in order to be understood as descriptive of the service. Barn–Barn is an example of a suggestive term. Because a suggestive service mark is inherently distinctive, no proof of secondary meaning is required for it to be protectable. An arbitrary or fanciful term bears no relationship to the service. Arbitrary and fanciful terms are also inherently distinctive, so they are protectable without proof of secondary meaning. Barnbarnfish is an example of an arbitrary or fanciful service mark.

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522–23 (11th Cir. 1991) (cleaned up); *see also Frehling Enters., Inc.*, 192 F.3d at 1335 ("An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., 'Sun Bank' is arbitrary when applied to banking services)."); *Laite*, 756 F.2d at 1540 (noting that suggestive marks are "comparatively weak" but "will be protected without proof of secondary meaning" and that fictitious/arbitrary/fanciful marks are "generally inherently distinctive" and therefore "strong" and "afforded the widest ambit of protection").

"The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The appropriate weight to be given to each of these factors varies with the circumstances of the case." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (citations omitted). "Of these factors, the type of mark and the evidence of actual confusion are the most important in this circuit," *Dieter*, 880 F.2d at 326, but actual confusion "is obviously not a

prerequisite to a finding of likelihood of confusion, as it is one of seven factors considered in the likelihood-of-confusion determination," *Wreal, LLC*, 38 F.4th at 137. "In reviewing the evidence, there are no set rules as to how much evidence of confusion is needed; rather, a district court must take into consideration the circumstances surrounding each particular case." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997) (quotation marks omitted).

## 2. Federal Unfair Competition/False Designation of Origin (15 U.S.C. § 1125(a))

"Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition in interstate commerce, and forbids unfair trade practices involving infringement of trademarks, even in the absence of federal trademark registration." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (alteration adopted, quotation marks omitted). "Section 43(a) is remedial in nature and should be interpreted and applied broadly so as to effectuate its remedial purpose." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001). "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Suntree Techs.*, 693 F.3d at 1346 (citation and emphasis omitted). "Common law and statutory trademark infringements are merely specific aspects of unfair competition." *Planetary Motion, Inc.*, 261 F.3d at 1193–94 n.5.

"To state a claim for unfair competition and false designation of origin, a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were likely to confuse the two," *Brain Pharma, LLC v. Scalini*, 858 F. Supp. 2d 1349, 1355–56 (S.D. Fla. 2012) (quotation marks omitted), which are the same elements required "to prevail on [a] federal claim of trademark

infringement," *Suntree Techs.*, 693 F.3d at 1346.  *Cf. Chanel, Inc.*, 362 F. Supp. 3d at 1262 (explaining that the "test for liability for false designation of origin under 15 U.S.C. § 1125(a) is the same as for a trademark counterfeiting and infringement claim – i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue").  Because the "legal standard for unfair competition under both the Lanham Act and the common law has been held to be essentially the same as the standard for trademark infringement," courts "apply the same seven-factor 'likelihood of confusion' test to claims brought under 15 U.S.C. § 1125(a) as well as infringement claims."  *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 91 F. Supp. 3d 1265, 1284–85 (S.D. Fla. 2015).  A false designation of origin claim "proscribes the behavior of passing off or palming off, which occurs when a producer misrepresents his own goods or services as someone else's."  *Custom Mfg.*, 508 F.3d at 647 (quotation marks omitted).

### 3. Florida Common Law Unfair Competition and Trademark Infringement

"Courts may use an analysis of federal infringement claims as a measuring stick in evaluating the merits of state law claims of unfair competition."  *Planetary Motion, Inc.*, 261 F.3d at 1193 n.4.  Indeed, "analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim."  *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1263 ("The analysis of liability for Florida common law trademark infringement is the same as the analysis of liability for trademark infringement under § 32(a) of the Lanham Act."); *cf. Custom Mfg.*, 508 F.3d at 652 (noting that a plaintiff's "failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its claim under Florida law").

### C.  Forms of Relief Available in Trademark Cases

#### 1.  Permanent Injunction

A district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." *See* 15 U.S.C. § 1116(a).  Indeed, injunctive relief "is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1509–10 (S.D. Fla. 1995) (quotation marks omitted).  In "ordinary trademark infringement actions complete injunctions against the infringing party are the order of the day.  The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks — even in cases in which more than one entity has a legal right to use the mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (alteration adopted, citation and quotation marks omitted).

"Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Id.* at 1208.  In "trademark cases, a sufficiently strong showing of likelihood of confusion may by itself constitute a showing of a substantial threat of irreparable harm." *Chanel, Inc.*, 362 F. Supp. 3d at 1263 (alteration adopted, quotation marks omitted).

In this Circuit, courts apply a "presumption of irreparable harm once a plaintiff establishes

a likelihood of success on the merits of a trademark infringement claim" because "infringement by its nature causes irreparable harm." *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1287 (S.D. Fla. 2010) (quotation marks omitted). The same presumption applies when analyzing permanent injunctions. *Id.* at 1287 n.4; *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) (explaining that the "standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success"); 15 U.S.C. § 1116(a) (noting that a plaintiff "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction").

"[E]ven in a default judgment setting, injunctive relief is available." *Chanel, Inc.*, 362 F. Supp. 3d at 1263. In fact, a defendant's "failure to respond or otherwise appear . . . makes it difficult for" a plaintiff "to prevent further infringement absent an injunction." *Id.* If a court determines that an injunction is warranted, its "broad equity powers allow it to fashion" whatever kind of injunctive relief is "necessary to stop" a defendant's "infringing activities." *Id.* at 1264.

## 2. Other Equitable Relief

Along with permanent injunctions, the Court's broad equity powers allow it to fashion whatever relief is necessary to stop or remedy infringing activities in a particular case. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Id.* "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Id.* (quotation marks omitted). "Equity has power to eradicate the evils of a condemned scheme by

prohibition of the use of admittedly valid parts of an invalid whole." *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724 (1944).

In the trademark context, district courts are expressly authorized to order the transfer of domain names that are "identical or confusingly similar to" a protected mark if the person who "registers, traffics in, or uses" the domain name "has a bad faith intent to profit from that mark." *See* 15 U.S.C. § 1125(d)(l)(A). "In any civil action involving the registration, trafficking, or use of a domain name under" § 1125, "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." *See* 15 U.S.C. § 1125(d)(l)(C). Courts have used this authority to order the transfer of infringing domain names, in addition to issuing permanent injunctions, as a means of providing comprehensive relief from future infringement. *See, e.g., Chanel, Inc. v. besumart.com*, 240 F. Supp. 3d 1283, 1291 & n.4 (S.D. Fla. 2016) (collecting cases in which courts in this District have "ordered the transfer of domain names" when faced with similar factual scenarios).

This is particularly true when defendants "have created an Internet-based counterfeiting scheme in which they are profiting from their deliberate misappropriation of" a plaintiff's rights. *See id.* Indeed, courts may fashion equitable relief "to eliminate the means by which" defendants conduct "their unlawful activities," and ordering "the cancellation or transfer of" domain names to a plaintiff, "where they may be disabled from further use as platforms for the sale of counterfeit goods, is appropriate to achieve this end." *See id.* Courts also have the inherent authority to order the transfer of any assets that were restrained "to assure the availability of permanent relief," such as funds that can be "used to satisfy an equitable award of profits." *Cf. Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) (recognizing a court's inherent authority "to order preliminary relief, including an asset freeze" to "assure the availability of

permanent relief").

### 3. Statutory Damages

"In a case involving the use of a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect . . . to recover, instead of actual damages and profits . . . an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1117(c). Those statutory damages can be "in the amount of . . . not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just," or "if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1)–(2). And as with any other "money judgment in a civil case recovered in a district court," "[i]nterest shall be allowed." 28 U.S.C. § 1961(a); *see also id.* § 1961(b) (explaining that interest "shall be computed daily" and "compounded annually").

Courts in this District have "defined willful infringement as when the infringer acted with actual knowledge or reckless disregard for whether its conduct infringed upon the plaintiff's copyright." *See PetMed Express, Inc.*, 336 F. Supp. 2d at 1219 (quotation marks omitted). In addition, courts "may infer that Defendants willfully infringed Plaintiff['s] copyrights because of Defendants' default." *Arista Recs., Inc. v. Beker Enterprises, Inc.*, 298 F. Supp. 2d 1310, 1313 (S.D. Fla. 2003). "An award of statutory damages is appropriate despite a plaintiff's inability to provide actual damages caused by a defendant's infringement." *See besumart.com*, 240 F. Supp. 3d at 1292. "Indeed, Congress enacted a statutory damages remedy in trademark counterfeiting cases because evidence of a defendant's profits in such cases is almost impossible to ascertain." *Id.* Overall, "[d]istrict courts have wide discretion in awarding statutory damages." *PetMed*

*Express, Inc.*, 336 F. Supp. 2d at 1219.

III.    **DISCUSSION**

As noted above, Plaintiff moves for a final default judgment, a permanent injunction, several other forms of equitable relief, and statutory damages. *See* ECF No. [43] at 1–2; ECF No. [43-3] at 10–15. Because injunctive relief is warranted only if Defendants have violated one or more of Plaintiff's trademark rights, *see, e.g.*, 15 U.S.C. § 1116(a); *Agad*, 911 F. Supp. at 1509–10, the Court first assesses whether Plaintiff is due a final default judgment on its counterfeiting, infringement, false designation of origin, and unfair competition claims, *see* ECF No. [19] at 10–14, before evaluating whether it is entitled to a permanent injunction, other equitable relief, or statutory damages.

A.  **Final Default Judgment**

Plaintiff has already obtained a clerk's default, *see* ECF No. [40], so final default judgment is appropriate if there is a "sufficient basis" for it in the Amended Complaint, *see Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245. A sufficient basis for default judgment exists if the Amended Complaint states a claim to relief that is plausible on its face — that is, pleads factual content allowing the Court to draw the reasonable inference that Defendants are liable for counterfeiting, trademark infringement, false designation of origin, or unfair competition. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41. Of course, for Defendants to be liable for the claims against them, Plaintiff must have pleaded factual content establishing each element of those claims.

1.  **Federal Counterfeiting and Trademark Infringement (Count I)**

Under § 1114, Plaintiff must show that: (1) it owns a valid trademark; (2) its mark has priority; (3) Defendants used the mark in commerce without its consent; and (4) Defendants' use

is likely to cause consumer confusion. *See Carnival Corp.*, 74 F. Supp. 2d at 1264–65; *Chanel, Inc.*, 362 F. Supp. 3d at 1262. Plaintiff's well-pleaded factual allegations — which Defendants by their default have admitted are true, *see TracFone*, 196 F. Supp. 3d at 1298 — satisfy this standard.

First, the Tissot Marks are valid trademarks. Plaintiff "has expended substantial resources developing" the Tissot Marks, *see* ECF No. [19] at 6, and has used them since 1959, 1993, 1999, and 2002, respectively, *see* ECF No. [19-1]. "[F]or an extended period of time," Plaintiff has used the Tissot Marks "in interstate commerce to identify and distinguish" Plaintiff's "high-quality goods" and to "serve as symbols of" Plaintiff's "quality, reputation and goodwill." *See* ECF No. [19] at 6. Because Plaintiff "extensively uses" the "Tissot Marks in the United States in connection with the sale of high-quality goods," the "Tissot Marks are widely recognized trademarks in the United States" and "have achieved secondary meaning among consumers as identifiers of high-quality goods." *See* ECF No. [19] at 6. The Court therefore agrees with Plaintiff that it owns common law trademark rights in the marks. *See* ECF No. [19] at 2, 14; *Surtain*, 789 F.3d at 1245 (noting that a defaulted defendant is not held to admit conclusions of law). And because the marks have been registered with the USPTO since 1991, 2003, 2016, and 2016 respectively, *see* ECF No. [19] at 5; ECF No. [19-1], Plaintiff also has statutory trademark rights in them, *see* 15 U.S.C. § 1115(a).

Second, the Tissot Marks have priority over the confusingly similar counterfeit marks Defendants have been using. As noted above, Plaintiff has used the Tissot Marks since 1959, 1993, 1999, and 2002, respectively. *See* ECF No. [19-1]. And as alleged in the Amended Complaint, Plaintiff "has used the Tissot Marks extensively and continuously before Defendants began offering counterfeit and confusingly similar imitations of Tissot's goods." *See* ECF No. [19] at 7. That is all that is required for the Tissot Marks to have priority. *See PetMed Express,*

*Inc.*, 336 F. Supp. 2d at 1218 (noting that a plaintiff's mark had priority because the plaintiff began using the mark before the defendant began using its competing mark).

Third, Defendants have used marks that are confusingly similar counterfeits of the Tissot Marks in commerce without Plaintiff's consent.  Specifically, they have established "various Internet based e-commerce stores" that "are promoting, selling, offering for sale, and/or distributing goods using counterfeits and confusingly similar imitations of" Plaintiff's "trademarks within this district, *see* ECF No. [19] at 1, 3, which is one way to use a mark in commerce, *PetMed Express, Inc.*, 336 F. Supp. 2d at 1218.  Plaintiff "has never assigned or licensed the Tissot Marks to any of the Defendants," *see* ECF No. [19] at 6, but Defendants are using Plaintiff's "famous name and/or trademarks to drive Internet consumer traffic to their e-commerce stores" which increases "the value of the E-commerce Store Names and" decreases "the size and value of" Plaintiff's "legitimate marketplace at" Plaintiff's expense, *see* ECF No. [19] at 5.

Fourth and finally, Defendants' use of the Tissot Marks is likely to cause consumer confusion.  Looking to the factors that determine likelihood of confusion, *Carnival Corp.*, 74 F. Supp. 2d at 1265, the Court finds that the Tissot Marks fall into the fictitious/arbitrary/fanciful category, *see Laite*, 756 F.2d at 1540.  In line with what courts in this District have concluded about other luxury brands, the Court recognizes that the Tissot Marks "are inherently distinctive because they are arbitrary as applied to the products which they identify—i.e., they do not suggest or describe the goods or services offered thereunder."  *See Chanel, Inc. v. chanel255.org*, No. 12-21762-CIV, 2012 WL 1941598, at *5 (S.D. Fla. May 29, 2012) (reaching the same conclusion about Chanel trademarks, which do not describe the purses, wallets, and luggage bearing them).  Like the Chanel trademarks evaluated in *chanel255.org*, some of the Tissot Marks bear the name of the company's founder, but they do not suggest or describe the watches bearing those marks.

*See* ECF No. [6-1] at 2.  Because the Tissot Marks are arbitrary marks, they are "inherently distinctive" and therefore "strong" and "afforded the widest ambit of protection."  *See Frehling Enters., Inc.*, 192 F.3d at 1335; *Investacorp, Inc.*, 931 F.2d at 1523; *Laite*, 756 F.2d at 1540.

Of the seven factors the Court uses to determine the likelihood of confusion, "the type of mark and the evidence of actual confusion are the most important in this circuit."  *Dieter*, 880 F.2d at 326.  So the fact that the Tissot Marks are in the strongest category and afforded the widest ambit of protection weighs heavily in favor of finding likelihood of confusion here.  Most of the other factors support that conclusion, including the similarity of the marks, the similarity of the products the marks represent, the similarity of the parties' retail outlets and purchasers, and the similarity of the advertising media used, and Defendants' intent.  *See Carnival Corp.*, 74 F. Supp. 2d at 1265.

The similarity of the marks is apparent after even a quick comparison, as Defendants' infringing products use the actual name "Tissot" and what appear to be identical symbols of the letter "T" inside a black square and the letter "t" shortened and inside a red square so that it resembles the Swiss flag.  *Compare* ECF No. [19-1], *with* ECF No. [6-4].  The products themselves are of the same type (watches), the retail outlets and purchasers are the same (online marketplaces and watch buyers), and the kind of advertising is the same (online).  *See* ECF No. [19] at 7–10. And though Defendants have not participated in this lawsuit such that the Court can know their actual intent, judging from the repeated use of the word "replica" on their websites, Defendants' apparent intent was to sell a copy of Plaintiff's products.  *See* ECF No. [6-4]; *Replica*, www.merriam-webster.com (last visited Apr. 15, 2025) (defining "replica" as "a copy").

Although Plaintiff does not allege or establish actual confusion, the Court can find likelihood of confusion without it.  *See Wreal, LLC*, 38 F.4th at 137; *Suntree Techs., Inc.*, 693 F.3d

at 1346.  On balance, the six factors in Plaintiff's favor outweigh the one factor in Defendants' favor.  Under the circumstances of this case, even in the absence of evidence of actual confusion, the Court finds that Defendants' products are likely to cause consumer confusion with the Tissot Marks.  *See Carnival Corp.*, 74 F. Supp. 2d at 1265; *Suntree Techs., Inc.*, 693 F.3d at 1346; *Longhorn Steaks, Inc.*, 122 F.3d at 138.  Having met all four elements of federal trademark infringement under § 1114, Plaintiff has stated a claim to relief that is plausible on its face.  *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  As a result, Plaintiff is entitled to final default judgment on Count I.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

### 2. Federal False Designation of Origin (Count II)

Under § 1125(a), Plaintiff must show that: (1) it has enforceable trademark rights in the Tissot Marks, and (2) Defendants made unauthorized use of those marks such that consumers were likely to confuse them with Defendants' imitations.  *See Brain Pharma*, 858 F. Supp. 2d at 1355–56.  Although described in two elements instead of four, those requirements are the same ones needed for a plaintiff to prevail on a federal claim of trademark infringement.  *See Suntree Techs.*, 693 F.3d at 1346; *Chanel, Inc.*, 362 F. Supp. 3d at 1262; *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85.  The only real difference between a claim under § 1114 and a claim under § 1125(a) is that relief is available for unregistered marks under § 1125(a) but not under § 1114.  *See Custom Mfg.*, 508 F.3d at 647.

But that difference does not change the likelihood-of-confusion analysis, because the "legal standard for unfair competition" is "essentially the same" as the one for trademark infringement.  *See Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85.  For that reason, the Court's findings in its analysis of Count I, *see supra* Section III.A.1, apply just as strongly to Count II.  Thus, the

Court finds that Plaintiff has enforceable trademark rights in the Tissot Marks and that Defendants made unauthorized use of those marks such that consumers were likely to confuse them with Defendants' imitations.  *See Brain Pharma*, 858 F. Supp. 2d at 1355–56.

Having met both elements of federal unfair competition and false designation of origin under § 1125(a), Plaintiff has stated a claim to relief that is plausible on its face.  *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  As a result, Plaintiff is entitled to final default judgment on Count II.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

### 3.   **Florida Common Law Unfair Competition (Count III)**

Courts use the same analysis to evaluate Florida common law unfair competition claims as they do to evaluate federal trademark infringement claims.  *See Planetary Motion, Inc.*, 261 F.3d at 1193 n.4; *TGC, Inc.*, 329 F.3d at 802.  For that reason, the Court's findings in its analysis of Count I, *see supra* Section III.A.1, apply also to Count III.  Because Plaintiff met all four elements of federal trademark infringement, the Court finds that it has also satisfied the standard for its Florida common law unfair competition claim.

Having satisfied the standard for its Florida common law unfair competition claim, Plaintiff has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  As a result, Plaintiff is entitled to final default judgment on Count III. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

### 4.   **Florida Common Law Trademark Infringement (Count IV)**

Courts use the same analysis to evaluate Florida common law trademark infringement claims as they do to evaluate federal trademark infringement claims.  *See TGC, Inc.*, 329 F.3d at 802; *Chanel, Inc.*, 362 F. Supp. 3d at 1263.  For that reason, the Court's findings in its analysis of

CASE NO. 24-CV-24767-MOORE/Elfenbein

Count I, *see supra* Section III.A.1, apply also to Count IV.  Because Plaintiff met all four elements of federal trademark infringement, the Court finds that it has also satisfied the standard for its Florida common law trademark infringement claim.

Having satisfied the standard for its Florida common law trademark infringement claim, Plaintiff has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41. As a result, Plaintiff is entitled to final default judgment on Count IV. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

Accordingly, Plaintiff has satisfied the elements and established Defendants' liability for trademark counterfeiting and infringement pursuant to § 1114 (Count I); false designation of origin pursuant to § 1125(a) (Count II); common law unfair competition (Count III); and common law trademark infringement (Count IV).  For that reason, I respectfully **RECOMMEND** that final default judgment **BE ENTERED** in Plaintiff's favor on Counts I, II, III, and IV.  *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244.

### B.  Permanent Injunction

Plaintiff has shown it is entitled to final default judgment on Counts I, II, III, and IV, *see supra* Section III.A, so the Court must now decide whether a permanent injunction against Defendants is an appropriate remedy, *see* 15 U.S.C. § 1116(a).  As an initial matter, the Court notes that injunctive relief is available in the default judgment setting — particularly in the trademark context — because a defendant's failure to respond or otherwise appear makes it difficult for a plaintiff to prevent further infringement without an injunction.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1263; *Agad*, 911 F. Supp. at 1509–10.

22

To prove a permanent injunction is warranted here, Plaintiff must demonstrate that it has suffered irreparable harm, remedies like money damages are inadequate, the balance of hardships favors awarding Plaintiff equitable relief, and a permanent injunction would not disserve the public interest. *See Angel Flight of Ga., Inc.*, 522 F.3d at 1208. Because Plaintiff has succeeded on its trademark infringement claim, the Court presumes it has been irreparably harmed, which means Plaintiff has satisfied the first element of the permanent injunction test. *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287 & n.4; *Amoco Prod. Co.*, 480 U.S. at 546 n.12; 15 U.S.C. § 1116(a). And courts in this District have already held there is no adequate remedy at law for the injury caused by a defendant's continuing infringement, so Plaintiff has satisfied the second element of the permanent injunction test as well. *See Agad*, 911 F. Supp. at 1509–10.

As to the balance of hardships, Plaintiff stands to lose the "reputation and goodwill" attached to the Tissot Marks, *see* ECF No. [19] at 11–12, if consumers believe Defendants' inferior-quality products are associated with Plaintiff. *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287 (explaining that confused consumers who buy the infringing product and are unsatisfied with it "might stop purchasing the original" product, which would leave the mark's owner "at the mercy" of the infringer because it had "no control over the quality" of the infringing product). Plaintiff also stands to lose sales. *See* ECF No. [19] at 12. Defendants, on the other hand, have no right to use the Tissot Marks — or the confusingly similar counterfeit marks they have been using — so they "could suffer no legitimate hardship by being forced to stop that which [they] had no right to do." *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1288. Thus, the balance of hardships favors Plaintiff, and it has satisfied the third element of the permanent injunction test. *See id.*

Finally, the Eleventh Circuit has explained that the public interest relevant to the issuance of a permanent injunction is "the public's interest in avoiding unnecessary confusion." *See Angel*

*Flight of Ga., Inc.*, 522 F.3d at 1209.  It has also noted "the public deserves not to be led astray" by inevitably confusing marks, which is why a "complete injunction" against an infringer is "the order of the day" in "ordinary trademark infringement actions."  *See id.* (quotation marks omitted). And courts in this District have concluded "the public as a whole has a paramount interest not to be confused" by a defendant's infringement.  *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1288 (quotation marks omitted).  Measured against those principles, the Court finds that preventing Defendants from using the Tissot Marks best serves the public interest because products bearing Defendants' counterfeit marks will likely cause consumer confusion.  *See supra* Section III.A.1.

Plaintiff has satisfied all four prongs of the permanent injunction test.  *See Angel Flight of Ga., Inc.*, 522 F.3d at 1208.  Accordingly, I respectfully **RECOMMEND** that a permanent injunction **BE ISSUED** against Defendants prohibiting them from using the Tissot Marks or the confusingly similar counterfeit marks they have been using.  *See* 15 U.S.C. § 1116(a); *Chanel, Inc.*, 362 F. Supp. 3d at 1264 (noting that a court's broad equity powers allow it to fashion whatever kind of injunctive relief is necessary to stop a defendant's infringing activities**)**.

### C.  Other Equitable Relief

Along with a permanent injunction, Plaintiff asks the Court to order additional equitable relief: (1) the cancellation of the e-commerce stores at issue or the transfer of them to Plaintiff; and (2) the permanent disabling, delisting, or de-indexing of the e-commerce stores and their websites from all search engines to ensure they cannot "be used as a means for selling goods bearing and/or using counterfeits and infringements of" Plaintiff's trademarks.  *See* ECF No. [43] at 1–2; ECF No. [43-3] at 10–15.  The Court's broad equity powers allow it to fashion whatever relief is necessary to stop or remedy infringing activities in a particular case.  *See, e.g.*, *Swann*, 402 U.S. at 15; *Bausch & Lomb Optical Co.*, 321 U.S. at 724.

Because Defendants sell their counterfeit products through websites, an order requiring the cancellation, disabling, delisting, or de-indexing of the e-commerce stores and their websites from all search engines so that they cannot be used as a means for selling counterfeit goods would certainly stop the infringing activities in this case. The same is true of Plaintiff's other requested remedy, the transfer of Defendants' e-commerce stores to Plaintiff. So both remedies fall within the Court's broad equity powers. *See, e.g.*, *Swann*, 402 U.S. at 15; *Bausch & Lomb Optical Co.*, 321 U.S. at 724.

Both remedies have also been expressly authorized by the federal trademark statute in situations where the infringer's domain name itself is "identical or confusingly similar to" a protected mark. *See* 15 U.S.C. § 1125(d)(l)(A). Indeed, in those situations the Court "may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." *See id.* § 1125(d)(l)(C). It makes sense, then, that courts in this District have used that authority to order the transfer of infringing domain names, in addition to issuing permanent injunctions, as a means of providing comprehensive relief from future sales of infringing products. *See, e.g.*, *besumart.com*, 240 F. Supp. 3d at 1291 & n.4 (collecting cases in which courts "ordered the transfer of domain names" when faced with similar factual scenarios).

Like those courts, this Court finds that the transfer to Plaintiff — or, alternatively, the cancellation, disabling, delisting, or de-indexing from all search engines — of the e-commerce stores and their websites is the proper equitable relief "to eliminate the means by which" Defendants conduct "their unlawful activities." Accordingly, I respectfully **RECOMMEND** that the Default Final Judgment **REQUIRE** the transfer to Plaintiff or, alternatively, the cancellation, disabling, delisting, or de-indexing from all search engines, of Defendants' e-commerce stores and their websites.

CASE NO. 24-CV-24767-MOORE/Elfenbein

### D. Statutory Damages

Finally, Plaintiff requests an award of statutory damages pursuant to 15 U.S.C. § 1117(c) and, as a means of collecting those damages, an "order transferring all funds currently restrained or held on account for Defendants by all financial institutions to" Plaintiff pursuant to Rule 65, 15 U.S.C. § 1117, and 28 U.S.C. § 1651(a). *See* ECF No. [43] at 1–2; ECF No. [43-3] at 10–15. The federal trademark statute expressly allows Plaintiff to elect to recover, instead of actual damages and profits, an award of statutory damages as a remedy for infringement. *See* 15 U.S.C. § 1117(c). Those statutory damages can be between $1,000 and $200,000 for each counterfeit mark for each type of good sold (or, if the infringement was willful, up to $2,000,000 for each counterfeit mark for each type of good sold). *See id.* § 1117(c)(1)–(2).

Here, Plaintiff requests statutory damages in the amount of $100,000 against each Defendant. *See* ECF No. [43] at 17–18. This amount, which when divided is only $25,000 for each of the four Tissot Marks, is well within the range allowed under § 1117(c)[3] and well within this Court's discretion. *See* 15 U.S.C. § 1117(c)(1)–(2); *PetMed Express, Inc.*, 336 F. Supp. 2d at 1219. And the record demonstrates that Defendants promoted, distributed, advertised, offered for sale, or sold at least one type of good bearing at least one of the Tissot Marks. *See* ECF No. [6-1]; ECF No. [43-1]; ECF No. [43-2]. As a result, the Court finds that Plaintiff is entitled to statutory damages.

The Court further finds that statutory damages of $100,000 against each Defendant is sufficient to deter them and others from counterfeiting or infringing the Tissot Marks, which is a

---

[3] That maximum of that range is on the low end $200,000 and on the high end $2,000,000. *See* 15 U.S.C. § 1117(c)(1)–(2). The high-end amount is available only when a plaintiff can show that the infringement was willful. *See id.* Because the Court can award Plaintiff its requested relief without exceeding the low-end amount, it does not need to make a finding as to Defendants' willfulness.

CASE NO. 24-CV-24767-MOORE/Elfenbein

stated goal of 15 U.S.C. § 1117(c).  *See Chanel, Inc. v. Sea Hero*, 234 F. Supp. 3d 1255, 1263 (S.D. Fla. 2016) (awarding $100,000.00 in statutory damages against each Defendant).  It will also compensate Plaintiff and punish Defendants, two more goals underlying § 1117(c).  *See id.* Accordingly, I respectfully **RECOMMEND** that Plaintiff **BE AWARDED** $100,000 against each Defendant as statutory damages for trademark infringement.[4]  And because the Court also has the inherent authority to order the transfer of any assets that were restrained to assure the availability of permanent relief, *see Levi Strauss & Co.*, 51 F.3d at 987, I further respectfully **RECOMMEND** that the Default Final Judgment **TRANSFER** all funds currently restrained or held on account for Defendants by all financial institutions to Plaintiff, up to and including the total amount of judgment, *see* Fed. R. Civ. P. 65, 15 U.S.C. § 1117; 28 U.S.C. § 1651(a).  Finally, because in any money judgment in a civil case recovered in a district court "[i]nterest shall be allowed," *see* 28 U.S.C. § 1961(a); *id.* § 1961(b), I respectfully **RECOMMEND** that Plaintiff **BE AWARDED** interest from the date of the Default Final Judgment, computed daily and compounded annually.

## IV.    CONCLUSION

Accordingly, I respectfully **RECOMMEND** that Plaintiff's Motion for Entry of Default Final Judgment Against Defendants, **ECF No. [43]**, be **GRANTED** as follows:

1.    Default Final Judgment **BE ENTERED** in favor of Plaintiff and against Defendants as to all counts of the Amended Complaint, *see* Fed. R. Civ. P. 55 and 58;

2.    Defendants, along with their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with them, **BE**

---

[4] The Amended Complaint also contains claims for false designation of origin (Count II), common law unfair competition (Count III), and common law trademark infringement (Count IV). The allowed scope of monetary damages for those Counts is contained within 15 U.S.C. § 1117(c). Accordingly, I respectfully **RECOMMEND** that judgment on Counts II, III and IV is limited to the amount awarded pursuant to Count I and entry of the requested equitable relief.

CASE NO. 24-CV-24767-MOORE/Elfenbein

**PERMANENTLY RESTRAINED AND ENJOINED**, *see* Fed. R. Civ. P. 65, from:

a. Manufacturing or causing to be manufactured, importing, advertising or promoting, distributing, selling or offering to sell counterfeit and infringing goods bearing and/or using Plaintiff's trademarks, or any confusingly similar trademarks;

b. Using Plaintiff's trademarks in connection with the sale of any unauthorized goods;

c. Using any logo, and/or layout which may be calculated to falsely advertise the services or products of Defendants as being sponsored by, authorized by, endorsed by, or in any way associated with Plaintiff;

d. Falsely representing themselves as being connected with Plaintiff, through sponsorship or association;

e. Engaging in any act which is likely to falsely cause members of the trade and/or of the purchasing public to believe any goods or services of Defendants are in any way endorsed by, approved by, and/or associated with Plaintiff;

f. Using any reproduction, counterfeit, copy, or colorable imitation of Plaintiff's trademarks in connection with the publicity, promotion, sale, or advertising of any goods sold by Defendants;

g. Affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation, including words or other symbols tending to falsely describe or represent goods offered for sale or sold by Defendants as being those of Plaintiff or in any way endorsed by Plaintiff and from offering such goods in commerce;

h.   Otherwise unfairly competing with Plaintiff;

i.   Using Plaintiff's trademarks or any confusingly similar trademarks within domain name extensions, metatags, or other markers within website source code, from use on any webpage (including as the title of any web page), from any advertising links to other websites, from search engines' databases or cache memory, and from any other form of use of such terms which are visible to a computer user or serves to direct computer searches to websites, Internet based e-commerce stores, seller identities or domain names registered by, owned, or operated by Defendants; and

j.   Effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth above.

3.   Plaintiff **BE AWARDED** the following equitable relief:

a.   To give practical effect to the Permanent Injunction, upon Plaintiff's request, the E-commerce Store Names identified on Schedule "A" hereto are hereby ordered to be immediately transferred by the corresponding Defendants, their assignees and/or successors in interest or title, and the Registrars to Plaintiff's control. To the extent the current Registrars do not facilitate the transfer of the E-commerce Store Names to Plaintiff's control within five (5) days of receipt of this Judgment, upon Plaintiff's request, those corresponding Defendants and the top level domain (TLD) Registry for each of the E-commerce Store Names, or their administrators, including backend registry operators or administrators, shall, within thirty (30) days, (i) change the Registrar of Record for the

Ecommerce Store Names to a Registrar of Plaintiff's choosing, and that Registrar shall transfer the E-commerce Store Names to Plaintiff, or (ii) place the E-commerce Store Names on Registry Hold status for the life of the current registration, thus removing them from the TLD zone files maintained by the Registries which link the E-commerce Store Names to the IP addresses where the associated websites are hosted;

b.  Plaintiff may serve this injunction on the e-commerce store's registrar(s) and/or the privacy protection service(s) for the E-commerce Store Names to disclose to Plaintiff the true identities and contact information for the registrants of the E-commerce Store Names;

c.  Defendants, their agents or assigns, shall voluntarily assign all rights, title, and interest, to their E-commerce Store Names to Plaintiff and, if within five (5) days of receipt of the Default Final Judgment, Defendants fail to make such an assignment, the Court shall order the act to be done by another person appointed by the Court at Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a);

d.  Defendants, their agents or assigns, shall instruct in writing all search engines to permanently delist or deindex the E-commerce Store Names and, if within five (5) days of receipt of the Default Final Judgment, the Defendants fail to make such a written instruction, the Court shall order the act to be done by another person appointed by the Court at the Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a);

e.  Plaintiff may serve this injunction on any e-mail service provider with a request

that the service provider permanently suspend the e-mail addresses which are or have been used by Defendants in connection with Defendants' promotion, offering for sale, and/or sale of goods using counterfeits and/or infringements of the Plaintiff's trademarks;

f.   Upon Plaintiff's request, Defendants shall request, in writing, permanent termination of any messaging services, e-commerce store names, usernames, and social media accounts they own, operate, or control on any messaging service, e-commerce marketplace, and social media website.

4.   Plaintiff **BE AWARDED** the following statutory damages in addition to the permanent injunctive relief awarded to Plaintiff:

a.   Plaintiff is awarded $100,000.00 against each Defendant pursuant to 15 U.S.C. § 1117(c), for which let execution issue forthwith, based upon the Court's finding that each Defendant infringed at least one trademark on one type of good. The Court considered both the willfulness of each Defendant's conduct and the deterrent value of the award imposed, and the award falls within the permissible statutory range under 15 U.S.C. §1117(c).

b.   To facilitate the collection of the statutory money damages awarded above — and pursuant to 15 U.S.C. § 1116, 28 U.S.C. § 1651(a), The All Writs Act, Federal Rule of Civil Procedure 65, and the Court's inherent authority — upon Plaintiff's request, Defendants and any financial institutions, payment processors, banks, escrow services, money transmitters, or marketplace platforms, including but not limited to, PayPal, Inc. ("PayPal"), and their related companies and affiliates, are to immediately (within five

CASE NO. 24-CV-24767-MOORE/Elfenbein

(5) business days) identify, restrain, and surrender to Plaintiff all funds, up to and including the total amount of judgment, in all financial accounts and/or sub-accounts used in connection with the E-commerce Store Names used by Defendants presently or in the future, as well as any other related E-commerce Store Name(s) and account(s) of the same customer(s), and any other account(s) which transfer funds into the same financial institution account(s). Such financial accounts and/or sub-accounts shall remain restrained until such funds are surrendered to Plaintiff in partial satisfaction of the monetary judgment entered herein. All financial institutions, payment processors, banks, escrow services, money transmitters, or marketplace platforms, including but not limited to, PayPal, and their related companies and affiliates, shall provide to Plaintiff at the time any funds are surrendered, a breakdown reflecting the (i) total funds restrained in this matter per Defendant; (ii) total chargebacks, refunds, and/or transaction reversals deducted from each Defendant's funds restrained prior to release; and (iii) the total funds released per Defendant to Plaintiff.

5. Plaintiff **BE AWARDED** interest from the date of the Default Final Judgment, compounded annually pursuant to the provisions of 28 U.S.C. § 1961.

6. The bond posted by Plaintiff in the amount of $10,000.00 **BE RELEASED** by the Clerk of the Court.

7. The Court **RETAIN** jurisdiction to enforce its Default Final Judgment and permanent injunction.

Pursuant to Local Magistrate Rule 4(b), the parties will have fourteen (14) days from the

CASE NO. 24-CV-24767-MOORE/Elfenbein

date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable K. Michael Moore, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

   **RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on April 16, 2025.


   **MARTY FULGUEIRA ELFENBEIN**
   **UNITED STATES MAGISTRATE JUDGE**


cc:  All Counsel of Record

CASE NO. 24-CV-24767-MOORE/Elfenbein

**SCHEDULE "A"**
**DEFENDANTS BY NUMBER, E-COMMERCE STORE NAME,**
**FINANCIAL ACCOUNT INFORMATION, AND MEANS OF CONTACT**

| Def. No. | Defendant / E-Commerce Store Name | Payee | Merchant ID / Payment Email | Means of Contact Email and WhatsApp |
|---|---|---|---|---|
| 1 | rotwatches.com | randtime | Y3W27R5PCAJRL | watchvipservice@hotmail.com<br><br>WhatsApp: 8614739706838 |
| 2 | salestoretoday.com | glotimepiece | GJY3SNFSSSWQ4 | watchvipservice@hotmail.com vipwatchesreplica@hotmail.com<br><br>WhatsApp: 8614739706838; 8618126097875 |
| | | glotimepiece | SLAQ7HVLTYENN | |
| | | □ □ □ □ □ □ □ □ 公司 | 7UP8PGXP99XVQ | |
| | | | xuaoquan8926@hotmail.com | |